FILED

2016 Apr-29  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MELINDA JAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:14-cv-01687-AKK** |
| **TOTAL SOLUTIONS INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Melinda James brings this case against Total Solutions, Inc. ("TSI") and Morayma McKinney ("McKinney") alleging racial discrimination (Counts I and II) and retaliation (Counts III and IV), in violation of 42 U.S.C. §1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.*, as amended. Doc. 1. Defendants now move for summary judgment, and their motion, doc. 25, is fully briefed and ripe for review, *see* docs. 26, 35, and 37. For the reasons explained more fully below, the motion is due to be granted.[1]

## I.      Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any

---

[1] The court also has for consideration the Defendants' Motion to Strike and Objections to Portions of the Declaration of Melinda James, doc. 36. Because the declaration helped the court to understand James' contentions in this case, the motion to strike is **DENIED**.

material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's

2

version of events is supported by insufficient evidence).   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."   *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).   Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."   *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL ALLEGATIONS

Morayma McKinney (Cuban-American) is the owner and CEO of TSI. Docs. 27-1 at 2; 27-2 at 95; 27-3 at 12, 17-18.   James (Caucasian) initially worked for TSI in 2008.   Doc. 27-2 at 16, 36.   TSI re-hired James in December 2009 as Program Manager for its Domestic Technical Operations Professional Services ("DTOPS") contract with the Centers for Disease Control and Prevention ("the CDC").   *Id*. at 39-42, 44, 86; docs. 26 at 7; 27-3 at 52; 27-4 at 52-56.   James held this position until her termination in October 2010.   Doc. 27-2 at 47-48.

The CDC is one of TSI's primary customers.   Doc. 27-1 at 2.   TSI supports the CDC's "Programs" sector and "Procurement and Grants Office" ("the PGO"). *Id*.   In the Programs sector, TSI provides employees to the CDC under specific task orders, which strictly limit the hourly rates, number of hours, and types of work

TSI employees may perform.  *Id*.  TSI employs a Program Manager to manage the TSI employees assigned to the CDC.  *Id*.  The Program Manager also interacts with CDC representatives to ensure that TSI meets the needs of the CDC.  *Id*.

As Program Manager, James' duties included recruiting employees for the CDC contract, approving timesheets and overtime, tracking hours on task orders, managing task orders and preparing proposals as necessary, preparing employee work authorizations and personnel action notices, and conducting evaluations. Docs. 27-2 at 394-395; 27-4 at 54-56.  Throughout James' tenure as Program Manager, McKinney received complaints about James' performance from TSI employees and the CDC.  Docs. 27-1 at 3; 27-3 at 114-116.  Stan Twyman, TSI's contracts manager, also received complaints about James from the CDC.  Docs. 27-2 at 104; 27-5 at 18.  The complaints involved employee turnover and government/employee relations.  Doc. 27-4 at 12-16.  For example, James purportedly failed to maintain a viable pool of potential employees to contact about promptly filling vacancies at the CDC, which resulted in TSI losing money until it could fill the vacancies.  Docs. 27-1 at 3; 27-4 at 12-16, 34.  James also purportedly had difficulty keeping up with work authorizations that governed the amount of hours the CDC authorized each TSI employee to work during a contract year.  Docs. 27-1 at 3; 27-3 at 124; 27-4 at 34.  James' purported mistakes led to unauthorized hours worked by TSI employees, which TSI had to absorb as losses.

Docs. 27-1 at 3; 27-4 at 34-35.  TSI also absorbed unnecessary costs to correct purported mistakes James made by inaccurately recording the hourly rates of some of the TSI employees she managed.  Doc. 27-1 at 3; *see also* doc. 27-2 at 152-160, 404-410.

To minimize the impact of James' deficiencies, McKinney assigned some of the Program Manager duties to Leslie Lewis (African-American) in May 2010. Docs. 27-2 at 121, 104; 27-3 at 64-69.  The reorganization entailed Lewis working out in the field and interfacing with the CDC and the TSI employees assigned to the CDC, while James primarily performed the office-based contractual-type actions, including performance evaluations.  Docs. 27-2 at 121; 27-3 at 67-69. Also, McKinney assigned James to backfill a vacant contract specialist position in the CDC's PGO sector in August, for approximately 45 days.  Docs. 27-1 at 3; 27-2 at 88; 27-3 at 70; 34-4 at 2.  During this time, Lewis, Yvette West (also African-American), and the corporate office assumed James' Program Manager responsibilities.  Docs. 27-2 at 91-92, 103, 204; 27-3 at 71-75; 34-4 at 2.

When James returned from the PGO backfill assignment, her performance issues worsened.  Doc. 27-1 at 4.  In late September, Ashley Wiggs, TSI's Human Resources Director, met with James.  Doc. 27-2 at 104, 144-147.  Unfortunately, the performance problems continued.  In October, James failed to timely provide McKinney with a plan of implementation to eliminate time overruns, and had

several issues with setting correct rates for employee compensation.  Doc. 27-2 at 155-160, 399-403, 406-410.  Consequently, TSI discharged James on October 25, 2010, for unsatisfactory performance, including budgeting issues, problems with program management, customer relations, employee relations, problems with time sheets, and an overall failure to reduce errors.  Doc. 27-2 at 47-48, 101, 133-134, 293, 388.  James filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 26, 2011.  Doc. 1-1.

North American Management ("NAM") hired James in November 2010 as a contract specialist for the CDC Information Management Service ("CIMS") contract NAM had with the CDC in the PGO sector.  Doc. 27-2 at 48-50, 52.  NAM's contract with the CDC had some overlap with TSI.  Specifically, when the CDC's Programs sector required assistance with a project, the PGO contractually defined the parameters, solicited bids, evaluated them, and awarded the contract to a winning bidder.  Doc. 27-1 at 2.  In this position, James solicited, obtained, and provided proposals to the CDC's technical organization for their review.  Doc. 27-2 at 54-55.  James also provided the information that was required from the technical organization to the CDC contracting officer, who made a final determination and bound the government contractually.  *Id.*

At some point during James' employment at NAM, TSI learned that James had management authority over proposals for CDC work from many different

companies, including TSI. *Id.* at 51-52. Because of concerns it had, TSI expressed to the CDC on July 25, 2012, that James may have a potential conflict of interest due to her pending EEOC charge against TSI. Docs. 27-3 at 135; 27-6 at 56-58, 73-75, 114, 119. CDC representatives assured TSI that no such conflict would arise because James was not a member of, and could not influence, the voting board that made contract award decisions. Doc. 27-6 at 74, 120. Still, the CDC's Alvin Hall instructed TSI to address any concerns to Dale DeFilipps if TSI needed further assurances. *Id.* at 58, 120. The parties apparently agree that TSI's disclosure of James' EEOC charge had no adverse impact on James' employment at NAM. Doc. 27-2 at 58-59. In fact, James left NAM voluntarily in September 2012 to accept a position as a contract specialist with the CDC. *Id.* at 59-61, 71, 279.

Two months after the CDC hired James, Hall approached McKinney to inquire about whether the CDC had resolved the potential conflict of interest between TSI and James. Docs. 27-1 at 4; 27-3 at 159. Hall directed McKinney to Steve Lester, the contracting officer at the CDC for the CIMS contract, and McKinney relayed her concerns to Lester. Docs. 27-1 at 4-5; 27-3 at 159-160. After this conversation, James continued working at the CDC, with no reduction in pay or responsibilities, until she resigned voluntarily to accept another position. Doc. 27-2 at 62-63. However, James contends that the CDC denied her a

promotion because of TSI's disclosure of the EEOC charge and that the CDC did not try to encourage her to stay when she mentioned the employment offer.

## III.   ANALYSIS

James raises claims of race discrimination (Counts I and II) and retaliation (Counts III and IV).  Specifically, she claims that TSI discharged her because of her race and retaliated against her for filing an EEOC charge.  *See* doc. 1 at 17-20.

### A.  Counts I and II – Racial Discrimination Claims

Title VII makes it unlawful "to discharge any individual, or otherwise discriminate against any individual . . . because of such individual's race," and 42 U.S.C. §1981 "prohibits intentional racial discrimination in the making and enforcement of . . . employment contracts."  *Washington v. Kroger Co.*, 218 F. App'x. 822, 824 (11th Cir. 2007) (citing 42 U.S.C. §2000e-2(a) and 42 U.S.C. §1981).[2]  Where, as here, James is attempting to prove intentional discrimination through circumstantial evidence, *see* doc. 35 at 15, the court utilizes the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), burden-shifting method of proof.  Under this method, James bears the burden of establishing a *prima facie* case of racial discrimination.  *See Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted).  If James satisfies her initial burden,

---

[2]  "Both Title VII and §1981 have the same requirements of proof and present the same analytical framework."  *Washington*, 218 F. App'x. at 824 (citing *Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1330 (11th Cir. 1998)).  "As a result, [the Eleventh Circuit applies] cases from both bodies of law interchangeably."  *Washington*, 218 F. App'x. at 824.

"then [the Defendants] must show a legitimate, non-discriminatory reason for [their] employment action." *Id.* (citation omitted). "If [the Defendants do] so, then [James] must prove that the reason provided by [the Defendants] is a pretext for unlawful discrimination." *Id.* (citation omitted). However, "[t]he ultimate burden of persuading the trier of fact that [the Defendants] intentionally discriminated against [James] remains at all times with [James]." S*pringer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citation omitted).

### i.   James' race claims fail because she cannot establish pretext

Because Defendants "assume, arguendo, that James can establish a prima facie case . . . .," doc. 26 at 25, the court also assumes that James has established her prima facie case. The court now moves to the next step in the *McDonnell* framework and finds that Defendants have articulated a legitimate, non-discriminatory reason for the employment action — i.e. they discharged James "because she performed poorly as a Program Manager." Doc. 26 at 26; *see also* docs. 27-2 at 143, 288; 27-3 at 114. Consequently, the burden shifts back to James to prove pretext. *See Burke-Fowler*, 447 F.3d at 1323. In that regard, James may demonstrate pretext "either directly by persuading the court that a discriminatory reason more [than] likely motivated the [Defendants], or indirectly, by showing that the [Defendants'] proffered explanation is unworthy of credence." *Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citing *McDonnell*, 411 U.S. at 804-05).  As to the latter method, James must rebut each of the articulated reasons.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).  However, "[a] reason cannot . . . be a 'pretext f*or discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason," *Blue v. Dunn Constr. Co., Inc.*, 453 F. App'x. 881, 884 (11th Cir. 2011) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original)).

Turning to the contentions here, at the outset the court notes that James argues at length that the complaints about her poor work performance are unfounded, and contends that she performed her duties exceptionally.  *See* doc. 35 at 27.  "[T]he fact that [James] thinks more highly of her performance than [the Defendants] is beside the point."  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  The court's "sole concern is whether unlawful discriminatory animus motivate[d]" her discharge.  *Alvarez*, 610 F.3d at 1266 (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002)).  James attempts to make this showing by shifting blame for the performance infractions to Lewis.[3]  *See* doc. 35 at 8, 25, 29.  However, whether Lewis, rather than James,

---

[3]   James contends that Lewis had difficulty keeping up with employee work authorizations and monitoring time sheets, which resulted in cost overruns, and lost TSI money. Doc. 35 at 8, 25, 29.  Additionally, James contends that any employee complaints after May 20,

caused the performance infractions overlooks that the relevant inquiry is whether the Defendants were dissatisfied with James for the articulated reasons, even if mistakenly or unfairly so, or instead merely used these reasons as cover for discrimination. *See Alvarez,* 610 F.3d at 1266 (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Ultimately, James has failed to present any evidence suggesting a race based reason for her discharge. In fact, James admits that she believes that McKinney, TSI's decision-maker, is not racist. Docs. 26 at 31; 27-2 at 15-16, 102. While James may believe that she performed her duties exceptionally, that alone is not enough to establish discrimination. After all, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)). Without any evidence from which a reasonable fact finder could conclude that the Defendants acted with racial animus or evidence that the CDC never lodged the complaints at issue while James, instead of Lewis, was in charge, James cannot succeed on her race discrimination claims. *See White v. Crystal Mover Servs., Inc.*, 2015 WL 3823716, at *1 (11th Cir. June 22, 2015) ("A

---

2010, should be attributed to Lewis who took responsibility for customer and employee relations on that date. *Id.* at 6, 28.

plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race.") (quotation omitted). Therefore, summary judgment is due to be granted on the discrimination claims.

### B. Counts III and IV – Retaliation Claims

In Counts III and IV, James alleges retaliation claims based on TSI's disclosures to the CDC on July 25, 2012, and November 14, 2012, that James filed a charge of discrimination against TSI.  Doc. 35 at 34-36.  Title VII makes it unlawful for an employer to retaliate "against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. 2000e-3a, and section 1981 encompasses retaliation claims, *see CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1956 (2008).  To establish a prima facie case, James must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) that there is a causal relation between the two events.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (applying the same three-part test to retaliation claims under §1981 and Title VII); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal citations omitted)).  James' claims fail because she cannot establish

12

that she suffered an adverse employment action — i.e. an "ultimate employment decision" or some other substantiality in the employment context, "such as termination, failure to hire, or demotion." *Crawford v. Carroll*, 529 F.3d 961, 980 (11th Cir. 2008) (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2000)). To the contrary, James admits that her job responsibilities and compensation at NAM and the CDC did not change, and that she sustained no adverse consequence as a result of TSI's disclosures.[4]  Doc. 27-2 at 58-59, 62-63, 174-175.

---

[4]  Although she concedes that the CDC hired her <u>after</u> the disclosure of her EEOC charge, *see* doc. 27-2 at 172-174, James alleges nonetheless that the CDC penalized her for filing the charge by denying her a promotion and not encouraging her to stay when she relayed that she had a job offer with another employer. Specifically, James maintains that after the CDC did not select her for a promotion, she asked Steve Lester if the decision had anything to do with the TSI issue, and that Lester's failure to confirm or deny her suspicion is evidence that the EEOC charge factored into the decision. Doc. 35 at 39. Concerned that the decision meant she would not receive any promotions at the CDC, James applied for a position with NASA. *Id.* However, before accepting the offer, James spoke with Jeffrey Napier, Director of the Office of Acquisition Services at the CDC, and Napier encouraged James to accept the position at NASA, purportedly because he shared James' view about the impact of the disclosure on her career at the CDC. *Id.*

A party simply cannot defeat summary judgment based on speculation and conjecture. *See Ellis*, 432 F.3d at 1326 (citing *Bald Mountain Park, Ltd.*, 863 F.2d at 1563) (conclusory assertions are "legally insufficient to defeat a summary judgment motion."). There is no evidence that Lester had any role in the promotion decision, and, even if he did, his silence may have been for a myriad of reasons unrelated to the EEOC charge. After all, Lester made it clear when he learned about the charge that it had no bearing on his assessment of James. *See* doc. 34-4 at 10 (Lester describing James as "extremely hardworking and the consummate professional . . . . I have reviewed her work . . . and found it to be exceptional . . . . the CIMS team would be at a severe loss without [James]."). Likewise, Napier may have encouraged James to accept the job offer for reasons unrelated to the EEOC charge — it did after all offer James a higher salary. The point is that the court simply does not know Napier or Lester's motivations for the two acts James mentions — and neither does James. Consequently, James' attempt to defeat summary judgment through speculation fails.

Perhaps because she recognizes the absence of an ultimate employment decision, James primarily argues that the disclosure rises to an adverse employment action because of its dissuading effect. Specifically, because an employee's decision to file an EEOC charge might be viewed negatively by future employers, James asserts that TSI's disclosure of her protected activity could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Doc. 35 at 38. Indeed, an adverse employment action is one "that a reasonable employee would have found [to be] materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). However, the amendment James filed to her EEOC charge after the TSI disclosure belies her contention that the disclosure would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Shannon v. Postmaster General of U.S. Postal Serv.*, 335 F. App'x. 21, 27 (11th Cir. 2009) (noting that the fact that the plaintiff filed his EEOC complaints after the adverse action casted doubt on whether the actions were the sort that might have dissuaded a reasonable worker from making a charge of discrimination). Moreover, while James contends that "the question is . . . whether she would have filed a charge in the first place [rather than an amendment]," doc. 35 at 39-40, the standard announced in *Burlington* is

14

meant to capture "those acts that are likely to dissuade employees from complaining." *Burlington*, 548 U.S. at 70.  It is purely speculative to contend that a then non-existent act that a former employer <u>may</u> one day take – here two years later – would dissuade a reasonable employee from making or supporting a charge of discrimination.  *See id.* at 53, 68.

Even if the court finds that James has established a prima facie case, her retaliation claims still fail because Defendants have articulated a non-retaliatory reason for their disclosure.  Specifically, Defendants contend that they raised the issue initially – and again later at the CDC's urging – to inquire about a perceived conflict of interest involving their former employee's involvement in TSI's receipt of contracts from the CDC.  While James contends that the Defendants' concerns were unfounded, James has failed to demonstrate that the Defendants did not reasonably have a concern about the alleged or potential conflict of interest.  *See Texas Dept. of Community Affairs*, 450 U.S. at 256.  In fact, James admitted that a conflict would exist if, in fact, she could influence the decision.  Doc. 27-2 at 56. This concession, albeit a theoretical one, supports Defendants' position that they had a legitimate reason for concern, and that their concern is one that is not unworthy of credence, especially where, as here, according to the CDC, Defendants apparently raised the issue because they "ha[d] not yet received an award."  Doc. 34-4 at 11.

## IV.   CONCLUSION

In sum, the Defendants' motion for summary judgment is due to be granted.

The court will enter a separate order in accordance with this memorandum opinion.

**DONE** the 29th day of April, 2016.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

16